Psychological Associates of Buckhead

**Expert Report of Anique Whitmore**
**Dated June 30, 2026**

United States District Court for the Northern District of Georgia
Atlanta Division

*N.N.*

*v.*

*Lincoln Bancorp, LLC*

*Civil Action File No. 1:25cv-04313MHC*

Plaintiff N.N. 3665

N.N. v. Lincoln High School, et al.
Civil Action File No. 1:25-cv-04313-MHC

## TABLE OF CONTENTS

I.      Biography

II.     Description of Assignment

III.    Background: What is sex trafficking?

IV.     Psychology of Sex Trafficking

      A.      What characteristics make a person vulnerable to sex trafficking?

      B.      What techniques do sex traffickers use to recruit their victims and cause them to engage in commercial sex?

      C.      Why might trafficking victims not try to escape or not seek help from family, medical professionals, or law enforcement?

      D.      What are the psychological consequences of sex trafficking on the victim?

V.      Assessment of Plaintiff N█████ N████████

Exhibit A – Case Documents Considered in Forming Opinions

Addendum A – Curricula Vitae

Addendum B – Retention Agreement with Fee Schedule Addendum

Addendum C – Consulting Testimony as of March 2026

Plaintiff N.N. 3666

## I.  Biography

My name is Anique Whitmore. I am a double graduate of Northwestern University with over 25 years' experience as a licensed psychotherapist. I specialize in forensic psychotherapy and forensic interviewing, and I have provided expert testimony in the areas of sexual abuse, sexual exploitation and human trafficking, intimate partner abuse, trauma-based therapy, and child and adolescent development. I have interviewed or worked in some capacity with more than 500 sex trafficking victims over the past 25 years.

I served as the Director of Forensic Services from 2006 to April of 2014 for the Fulton County District Attorney's Office in Atlanta Georgia where I oversaw forensic services in Superior and Juvenile Court, assisted with pre-trial preparations by collaborating and educating attorneys about an individual's capacity to communicate his or her trauma, and functioned as a resource on how to effectively question experts and analyze victim/witness statements.

I was an instructor for the national forensic training Child First for twenty years, have presented at national conferences, have spoken to Atlanta's high-risk youth, law enforcement, and legal audiences on topics of Child Sexual Abuse, exploitation and human trafficking, domestic violence, child development, and forensic interviewing.

I have been qualified as an expert to testify in hundreds of cases spanning 32 different jurisdictions in the United States and abroad, including federal court, the US Armed Forces, Superior Court, and Juvenile Court. I have testified in both criminal and civil cases and on behalf of civil plaintiffs, civil defendants, prosecutors, and criminal defendants. I consult and instruct with the U.S. Army Judge Advocate General ("JAG") on cases involving trauma and testify in Court Martials nationally when subpoenaed by the Pentagon.

My private practice encompasses a broad spectrum of clientele ranging from adolescents to adults, most of whom present with interpersonal conflict, trauma, and/or relationship discord. My fee is $400 per hour for high-risk populations, including victims of sex trafficking, and this rate is comparable to the rates of my colleagues providing similar services with comparable work history and other experience.

I previously served as the Executive and Clinical Director of the Northwest Georgia Child Advocacy Center and as Program Manager for the Georgia Center for

Child Advocacy Center in Fulton and Dekalb Counties.

Finally, I have appeared and analyzed cases as an invited guest expert on CNN, TvOne, the Nancy Grace Show, CBS, and Fatal Attraction. And I have appeared as a special invited consultant on Jada Pinkett Smith's CNN documentary "The Freedom Project," exposing the world of human trafficking.

## II.    Description of Assignment

I was retained by the law firm of Andersen, Tate & Carr to prepare an expert report in connection with the matter of N.N. v. Lincoln Bancorp, LLC, Civil Action File No. 1:25-cv-04313-MHC, currently pending before the United States District Court for the Northern District of Georgia. My task in this engagement was to examine the nature of the trafficking the Plaintiff experienced and to offer a professional assessment of whether the vulnerabilities she faced, the methods used to exploit her, the barriers that prevented her from escaping, the impacts she suffered, and the environment she was subjected to are consistent with what are commonly seen in sex trafficking situations.

I have also provided my current curriculum vitae (Addendum A), my retention agreement including schedule of fees (Addendum B), and a list of the cases on which I have provided expert testifying services (Addendum C).

## III. Background: What is sex trafficking?

Sex trafficking of minors occurs when a minor is induced into a commercial sex act, and does not require any force, fraud, or coercion, though those factors are often also present.[1] Sex trafficking of adults occurs when a perpetrator, often referred to as a

trafficker or pimp,[2] takes an 'action' (induces, recruits, harbors, transports, provides) and then employs the 'means' of force, fraud or coercion for the 'purpose' of compelling the victim to provide commercial sex acts.[3] On the other hand, prostitution is when an adult engages in commercial sex without force, fraud, or coercion.

From my experience, laypersons often misunderstand sex trafficking. The most pervasive myth about sex trafficking is that it often involves kidnapping or physically

---

[1] Polaris Project, The Action-Means-Purpose (AMP) Model.

[2] In this report, I am using the terms "trafficker" and "pimp" interchangeably to refer to the person who traffics persons for sex.

[3] Polaris Project, The Action-Means-Purpose (AMP) Model.

Plaintiff N.N. 3668

forcing someone into a situation.[4] In reality, most traffickers use psychological means such as tricking, defrauding, manipulating or threatening victims into providing sex, often in exchange for money or some other thing of value. Thus, in many cases, the trafficker succeeds in trafficking his victims by controlling the mind of the victim. As anthropologists Christina and Richard Milner have explained, "A pimp wants his woman's mind more than her body. It is love, loyalty, and obedience he requires as well as a capacity for self- discipline." Brock, a pimp, put it to the Milners this way: "You create a different environment. It's a brainwashing process; the whole thing is creativity."

Laypersons often falsely believe that human sex trafficking only involves humans being sold through complex schemes, transported internationally, or preyed upon by the rich and famous. Although these occurrences do, or could, exist, it is far more common to find sex trafficking between a victim and one or more traffickers. Often, these trafficking scenarios involve local victims being sold by similarly local traffickers. A trafficking operation might be simple, relying on only internet ads to sell victims for sex. This dynamic can resemble a business transaction where there is a "CEO" and his/her employees. These employees may market their 'services' online in such places as Backpage or Plenty of Fish (or a modern equivalent like Megapersonals), Craigslist, Facebook, Twitter, etc. Other times, the traffickers find locations that allow the victims to walk the parking lot or street to find "Johns"[5] who will pay them for sex.

Moreover, traffickers are not always strangers to their victims. Indeed, a person can be trafficked by their own family members or legal guardians, spouses and intimate partners. Finally, sex trafficking can occur in any business – not just in sexually oriented businesses like escort services or strip clubs. One of the most prevalent places to find sex trafficking is in the hotel industry, where traffickers find a location conducive to their victims to providing sexual acts.

Early in my career, it was more common to see sex trafficking victims physically advertising themselves on the street at the direction of their traffickers. As internet-based services allowed victims to be advertised online, the vast majority of trafficking migrated there. This increased the amount of trafficking occurring over and over in the

---

[4] Dr. Dominique Roe-Sepowitz, an Associate Professor at the School of Social Work and Director of the Office of Sex Trafficking Intervention Research (STIR) at Arizona State University.
Trick Roll Study: Forced Criminality in Sex Trafficking Situations.

[5] "Johns" is a common slang term for buyers of commercial sex.

same location, like a hotel. The victim could remain in one location and advertise to Johns online, and then direct them to the hotel. As some hotels or motels were permissively allowing this activity, it created growth in sex trafficking by offering anonymous, easy, and relatively safe environments for Johns to buy sex.

## IV. Psychology of Sex Trafficking:

### A.    What characteristics make a person vulnerable to sex trafficking?

Sex traffickers typically prey on vulnerable individuals, including individuals who are economically insecure, socially isolated, drug-dependent, or psychologically weak.

Victims come from all walks of life, but most are vulnerable.  There is no broadly accepted definition of the terms "vulnerable" and "vulnerability" in relation to trafficking. In much of the literature on trafficking, the terms "vulnerable" and "poor" have been used synonymously, and poverty is often cited as a leading cause of trafficking. Vulnerability, however, is not the same as income-poverty or poverty even more broadly defined. In published literature, for example, vulnerability does not refer to lack or want, but rather to exposure and defenselessness. Vulnerability refers to the condition of a person in a specific context. Thus, one may be vulnerable due to external factors, such as poverty, but also internal ones, like one's coping mechanisms that enable the individual to protect him or herself against a negative impact from those external conditions.

Often, victims of sex trafficking have experienced some degree of hardship or trauma making them vulnerable to sex trafficking. Such experiences might include unstable living conditions with limited economic opportunity, a lack of consistent and safe relationships with supportive adults, prior sexual assault or other forms of victimization, and other types of emotional or behavioral traumas.

These and similar experiences—along with the allure of opportunity, the relentless demand for products or services, and the desire for reliable income—drive people into potentially dangerous situations where they are at risk of being exploited.

### B.    What techniques do sex traffickers use to recruit their victims and cause them to engage in commercial sex?

Traffickers use various physical, emotional, and psychological techniques to

Plaintiff N.N. 3670

cause a victim to engage in commercial sex.[6] Below is a non-exhaustive list of several common methods for recruiting and grooming sex trafficking victims. Although each case of trafficking might be different, the result is often very similar: Victims are brainwashed to believe that their treatment and living conditions as a sex trafficking victim are normal, which makes the victims even more submissive. The more submissive the victim the less resistant toward their trafficker they become, which leaves the victim vulnerable to emotional and physical abuse.

## Lover Method

Sex traffickers, along with many other criminal organizations, often use the "lover" method to recruit and control victims. In this method, a trafficker convinces his victim that there is a love relationship between them. This love deception is common in many sexual exploitation cases as well.

Sex traffickers often continue to groom their victims by using false romantic love, friendship, and familial love to manipulate victims into cooperating in their own exploitation. The way love is weaponized and wielded depends on the type of trafficking situation. Romantic love is also a powerful part of the trafficking arsenal. The classic scenario involves "Romeo pimps" who purposefully target women or girls and sweep them off their proverbial feet, then slowly and carefully convince the victim that the pimp's love requires her to sell sexual services.

In the hands of human traffickers, love is one of the most powerful weapons. While the myths and stereotypes about human trafficking make it seem like most trafficking begins with kidnapping and violence, the reality is that a huge percentage of sex trafficking victims were exploited by someone they loved and trusted. The way in which this process plays out is not always the same and not always blatant. But if one understands how sex traffickers groom their targets through manipulation of love, the observer can see it happening and predict the grave outcome.

This lover method may also involve the presentation of gifts, from large gifts such as cars or fancy clothes to something as simple as a cell phone and the chance for the victim to call an ailing family member. Likewise, traffickers might dole out their love strategically, displaying favoritism to certain victims over others to manipulate and retain loyalties. The rotation of favorites often creates confusion and discord among victims leading to isolation, distrust, and competition to become what traffickers call the "bottom bitch," *i.e.*, the victim who is at the top of a hierarchy of prostitutes within a sex

---

[6] *See* Author, The Pimp Game: Instructional Guide (2018) (describing the psychological manipulation that traffickers use to control the minds, bodies, and spirits of others).

N.N. v. Lincoln School, et al.
Civil Action File No.1:25 cv-04313-MHC

Case 1:25-cv-04313-MHC    Document 47-5    Filed 07/07/26    Page 8 of 31

trafficking operation.

Once emotionally involved, victims are even more vulnerable to manipulation by the trafficker through, for example, threats, drugs, and psychological coercion. One survivor of exploitation passionately described this method as follows:

> When a pimp hits on a woman or teenager who is resistant, "prudish," or scared, he usually does not introduce prostitution immediately. He'll just be a nice guy who buys her a meal and offers her a place to stay. Then he makes his play for her as a lover. When a sexual relationship between them is established and he is sure she loves him, his next move is to set her up to prostitute herself as a condition of her love for him, with lines like, "If you love me, you'll do anything for me." If she resists or refuses, he will likely pout, create a scene, and insist that she does not truly love him. To restore his affection, she finally agrees to do what he asks, telling herself that "one time won't hurt," or "what does it matter." This rationale, used by women faced with unwanted sex from husbands, fathers, lovers, and rapists alike, is an entry into prostitution too. When she concedes to it, he has her hooked. When she turns one trick, he starts pimping her. He gives her nightly quotas, takes the money she earns, and begins to treat her as the slut he intends to make her think she is. He tells her, "You are nothing but a goddamn whore," and makes her believe that only out of the goodness of his heart will he have anything to do with such a despicable creature. She knows that is what society thinks of her. She knows she is a criminal. And most likely, she has nowhere else to turn.[7]

## Force, Threats of Force, and Verbal Abuse

Traffickers often use force or threats of force, including rape, beating, captivity, and isolation, to recruit and control a victim. The early period of this type of victimization is often referred to as the "seasoning process" in which the traffickers gain control through violence. Victims are often terrified and succumb at the hands of their traffickers. New victims may be forced to watch physical abuse, forced sexual acts, rape, and torture of other victims to ensure adherence and obedience. These coercive acts of violence keep victims fearful and controllable. Traffickers also often use verbal abuse, including debasing remarks, to demoralize victims and belittle their already fragile self-worth. Traffickers who rely largely on brutal violence to control their victims are often referred to as "gorilla" or "guerilla" pimps.

---

[7] Barry, K. (1996) The Prostitution of Sexuality. NYU Press.

Plaintiff N.N. 3672

## Manipulation

Similarly, to ensure unbreakable control, the trafficker toys with the victims' emotions and diminishes the victims' trust and friendships with others. In this method, victims are kept emotionally and physically on edge to create an invisible bond, where the trafficker may be seen as the potential source of comfort and humiliation at the same time. As the relationship grows, the trafficker slowly cuts the victim off from friends and loved ones, strengthening the sense of dependency.[8]

## Other Fraud and Deception

The trafficker typically also uses other forms of deception to recruit and control their victims. This includes false statements and concealment of facts. For example, traffickers often initially suggest false or misleading facts about the work the victims will engage in, hiding the existence of commercial sex. Traffickers also might make false promises of a glamorous future.

One survivor explained this method as follows:

> All the promises made in the first meeting -- glamour, travel, money, affection, protection, even childcare if she is on her own with a small child -- turn out to be means of enslavement. When the pimp controls his woman's body and soul, then she is set up to bring other women to him. And the cycle of loving her, seasoning her, and pimping her starts all over again.[9]

## Drug Dependence

Many sex trafficking victims were victimized because of their own drug addiction. Human traffickers often use drugs as bait to recruit people who have a substance use disorder. Or traffickers may use drugs as a means of control over their victims; to force compliance, harder work, longer hours, create dependency, to keep them "drugged out" so they do not attempt escape, or withhold the source as a form of punishment.

> **C.    Why might trafficking victims not try to escape or not seek help from family, medical professionals, or law enforcement?**

---

[8] Buncab, Heirendt (2017). Human trafficking. Medical Response to Adult Sexual Assault: A Resource for Clinicians and Related Professionals.

[9] Barry, K. (1995) Pimping: The World's Oldest Profession. OTI Magazine Online.

Plaintiff N.N. 3673

One question I often get is, "Why don't sex trafficking victims try to escape?" Or to put it another way, "Why do these victims endure such suffering without reaching out for help to law enforcement, family members, or friends?"

There are many reasons why a sex trafficking victim would be unable to escape or reach out for help. Below, I have identified several of these reasons, but these are not mutually exclusive or exhaustive. And each victim is different and impacted by these factors in different ways based on their own experiences and vulnerabilities.

*First*, although it may be clear to outsiders that the victim is being trafficked for sex, often the victim herself does not perceive it that way. Indeed, in most trafficking situations, the victim does not realize she was a victim until long after the trafficking has ended or once they've become too embedded to try to escape. Over time, this behavior becomes normalized, so that the victim thinks she is making decisions on her own.

*Second*, even if a victim might perceive at times that she is a victim of sex trafficking, in many cases, the victim may have formed a "trauma bond" with her trafficker. A trauma bond is a close attachment formed between a perpetrator of abuse and the person they perpetrate against. Trauma bonding occurs as a result of calculated, repetitive infliction of psychological trauma, which is intended to instill terror and helplessness, to destroy the victim's sense of self in relation to others, and to foster a pathological attachment to the perpetrator. Interestingly enough, many victims endure continued abuse and/or "stay" in order to 'relieve' other victims from the attention of their trafficker. Thus, because of their shared trauma, victims will at times form undeniable, yet untold, interpersonal connections. This may develop much more quickly for a vulnerable person who does not perceive themselves as having other options for food, shelter, or emotional support.

The dramatic ups and downs of a trafficker-victim relationship often result in a powerfully unhealthy relationship infused with trauma bonds. In order to survive, trauma survivors develop a keen awareness of everything their perpetrator does, says, and wants. As a result of this prolonged intense focus on their perpetrator, the trauma survivor risks eventually disconnecting from their own sense of self, needs, and values.[10] When this type of bonding occurs, the trauma survivor is likely to express feelings of love toward her abuser, in addition to fear, and maybe even hatred.

---

[10] Theresa Miller (2021). Trauma Bonding: A Therapeutic Help To Break The Cycle of Psychological Abuse.

Plaintiff N.N. 3674

N.N. v. Lin, et al. Case No.
Civil Action File No.1:25 cv-04313-MHC

Case 1:25-cv-04313-MHC   Document 47-5   Filed 07/07/26   Page 11 of 31

Psychological literature defines trauma bonded victims similar to how forensic psychotherapists define the trafficked human victim. Victims who are coerced into a trauma bond were more likely to have experienced:

- *Prolonged abuse* in a context of captivity – with an abuser who uses power and control tactics to keep the survivor submissive, isolated, and unable to flee

- *Terror* – as a result of ongoing violence and/or threats of violence or death against themselves and/or their loved ones and pets

- A *loss of identity* and sense of independence

- *Loss of control* over their body and bodily functions – due to the perpetrator's control over every aspect of their daily life (e.g., if, when, and what they can eat; when and how long they are allowed to sleep).

- *Social Isolation* – from everyone except the perpetrator – so that the only emotional connection the survivor has available is with the perpetrator.

- *Coercion* – by the perpetrator, to witness or engage in the violation of others

In many cases, due to the sustained manipulation and brainwashing, a trafficker simply needs to order his victims not to report anything, and the victims—out of the loyalty to the trafficker that the trafficker has cultivated— just comply.[11]

*Third*, a fear of violence might animate a trafficking victims' decision not to try to escape or seek help. In some cases, traffickers directly threaten their victims with violence if the victims try to escape or seek help from outsiders. Traffickers might also threaten violence against the victims' family or friends if the victim tries to escape. And a sex trafficking victim might be unwilling to attempt an escape from her trafficker for fear that another, scarier or more dangerous pimp might traffic them instead.

*Fourth*, similarly, the sex trafficking victim may fear the uncertainty of life outside of trafficking more than the known fear of her trafficker or the trafficking itself. This happens often when a victim has become drug addicted and/or is homeless. Not unlike the adage of, "the grass isn't always greener on the other side". Many victims are

---

[11] Sanchez RN, Rosario & Stark, Sharon W. PhD. (2014). The Hard Truth About Human Trafficking.

Plaintiff N.N. 3675

coerced and manipulated to believe there 'is' no other 'side' outside of the exploiter's control.

*Fifth*, often a trafficking victim fears law enforcement. This could be because of a history of negative interactions with law enforcement. But in many cases, this fear grows out of warnings from her trafficker that if the victim reports the trafficking to law enforcement, the victim herself will face serious criminal consequences or violent consequences from the trafficker or his associates, even if he were arrested.

*Sixth*, a trafficking victim may feel like there is no point in reaching out for help or trying to escape if the victim has been surrounded by others who are trafficked and has either seen others unsuccessfully try to escape or seek help or has herself tried, but failed, to get help or escape.

The reasons above are not the only ones that factor into a victim's inability or hesitancy to seek help or try to escape, but they are some of the most common ones.

### D.    What are the psychological consequences of sex trafficking on the victim?

Sex trafficking has an impact on the individuals it victimizes in all areas of their lives. As previously stated, every stage of the trafficking process can involve physical, sexual and psychological abuse and violence, deprivation and torture, the forced use of substances, manipulation, economic exploitation and abusive living conditions.[12]

Trafficking usually involves prolonged and repeated trauma. This trauma can lead to a variety of psychological problems including, for example, post-traumatic stress disorder, anxiety, depression, alienation, disorientation, aggression and difficulty concentrating, and homicidal or suicidal ideations. Moreover, studies have indicated that trauma worsens during the trafficking process and persists beyond the end of any exploitive act or acts.[13] This means that, without proper help, a trafficking victim's psychological condition could last throughout their life.

The results of the traumatic experience of trafficking often manifest when a trafficking victim is asked to communicate about the trafficking. In many cases, a victim may be unable to comprehend what happened to her without extensive psychological treatment. And even then, victims often feel instantly re-traumatized when they are asked to talk about what occurred. This can make the process of questioning sex

---

[12] *See* Panigabutra-Roberts. (2021). Human Trafficking in the United States. Part I. State of the Knowledge.

[13] United Nations Office on Drugs and Crime (2008). An Introduction to Human Trafficking: Vulnerability, Impact and Action.

Plaintiff N.N. 3676

trafficking victims very challenging.

I have worked extensively with the Atlanta FBI Drug and Special Forces division to help guide law enforcement and others in how to talk to sex trafficking victims. In my experience, it is often difficult to find the balance of questioning for evidence and the well-being of the victim themselves. Victims may appear to those around them, even support persons, to be uncooperative, irritable, hostile, aggressive or ungrateful. The stigma attached to them as victims has been shown to have a significant and ongoing impact on their lives, including the trauma experienced by the individual victim as well as the possibility of physical rejection by family and/or community when reintegration is attempted. The long-term consequences of human trafficking on individuals are complex and depend on many factors, with no guarantee of recovery. Revictimization is often a further consequence of the trafficking, for which public policy has yet to find a solid resolution.

The trauma of trafficking could also have an effect on a victim's memory. A traumatic incident can cause a great deal of stress in both short term and long term memory. Trauma-based memory loss occurs when trauma creates stress that negatively affects the brain. Trauma can shut down episodic memory and fragment the sequence of events. Trauma can prevent information from different parts of the brain from combining to make a semantic memory, *i.e.*, a memory of meaning.

Severe injuries and physical trauma can also produce post-traumatic stress disorder, which can cause temporary memory loss to help a person cope with the traumatic event that caused the injury. In the case of physical trauma, the length of memory loss depends on the severity of the injury. And factors such as malnutrition, physical exhaustion, and drug addiction can also increase the extent of a trafficking victim's memory loss caused by PTSD.

Emotional or psychological trauma can also affect memory. Memory loss is a natural survival skill and defense mechanism humans develop to protect themselves from psychological damage. Emotional or psychological trauma can also lead to PTSD stress disorder, which can manifest itself in different ways including flashbacks of the event and intrusive, unwanted thoughts about the trauma. Repressed memories and PTSD are also common. Without treatment, these repressed memories may resurface at any time with a trigger event and if they are revisited over and over, the brain continues to experience the trauma once again each time.

Return and reintegration for a trafficked individual is a long-term and complex process. Even when physical problems can be addressed and stigma overcome,

Plaintiff N.N. 3677

trauma and psychological damage make recovery a difficult task rendered even more so by the problems in accessing necessary resources and when trying to communicate their nightmare with support persons and family. Victims learn survival skills in order to make a better life for themselves at the hands of their traffickers, but at some point, victims may reach total mental defeat and hopelessness. In this way, the trafficked individual leads a long road to recovery because of the mental and coercive manipulation sustained.

Some trafficked victims may not be able to adjust to a lifestyle that they previously considered "normal" without significant and persistent intervention, home relocation, intense trauma informed psychotherapy, and emotion regulation treatment focused on safety and stabilization. If employment can be found, a trafficked person's behavior, as a result of the experiences of severe trauma, may make it difficult to retain employment. The need to find trusting, loving, and empowering interpersonal relationships is dramatically skewed by the trafficking experience. Healthy, loving, relationships do not involve violence and abuse and are characterized by physical and emotional safety, mutual respect, honesty, accountability, fairness, shared responsibilities to name a few. The trauma bonded relationship is the opposite, involving

violence and a lack of physical and emotional safety, mutual respect, honesty, etc.[14] In addition, many victims don't seek the before noted available assistance nor do they dare ask for help because they lack the awareness that help exists and they have essentially been brainwashed into fear which disallows them to visualize an afforded opportunity to seek another life's path.

In my experience with victims of sexual assault, I have often seen how one acute incident, such as a rape, creates long-term, at times life-long traumatic effects on some victims. Victims of sex trafficking, however, suffer not just one acute traumatic event, but compound traumatic events over and over throughout the days, weeks, or months of being trafficked. This repeated psychological and sexual abuse in turn compounds the effects of the trauma, with each incident building on the prior traumatic events.

## V.    Assessment of N.N.

The law firm of Andersen, Tate & Carr has asked for a clinical assessment of the plaintiff in the above-referenced case. I have been asked to evaluate and provide my opinion as to the following:

---

[14] *Zimmerman, Hossain, & Watts. (2021).  Human trafficking and health: A conceptual model to inform policy, intervention and research.  Social Science & Medicine.*

Plaintiff N.N. 3678

1.    What vulnerabilities were present in the victim's life that were consistent with common vulnerabilities found in sex trafficking victims?

2.    Were the methods of exploitation used by the victim's trafficker consistent with the common methods of exploitation found in other sex trafficking victims?

3.    Were the reasons for the victim's inability to escape or seek help consistent with those commonly found among sex trafficking victims?

4.    Were the effects of the victim's trafficking consistent with the effects commonly found among sex trafficking victims?

5.    Was the trafficking environment reported by each victim consistent with environments commonly used in sex trafficking operations?

To reach my conclusions, I interviewed the plaintiff over Zoom and reviewed the documents listed below, along with the sex trafficking allegations in her case. Through this process, I looked at N.N.'s trauma history, her behavior over time, and how her experiences, including the trafficking, may have affected her social and emotional wellbeing today.

At the start of our meeting, I explained to N.N. why we were speaking: to conduct an evaluation related to her case. I also went over the limits of confidentiality and made clear that we were not entering a therapist-client relationship. I told her that what she shared with me would be included in a written report sent to her attorneys. I also made clear that my role was to provide an honest, balanced evaluation, one that would draw from multiple sources, including N.N.'s own account.

My conclusions below are based on the information made available to me and my own expertise in this subject. If additional information is provided after the report is submitted, an appended report may be provided. The additional information may or may not change the opinions and conclusions contained within.

In rendering my opinions, I considered the documents that the plaintiff's attorney provided me listed in Exhibit "A".

A.    **N̲̅▮▮▮▮ N̲̅▮▮▮▮▮▮**

1.    **Sources of Opinion**

Plaintiff N.N. 3679

N.N. v. Lighthouse, et al.
Civil Action File No.1:25 cv-04313-MHC

Case 1:25-cv-04313-MHC    Document 47-5    Filed 07/07/26    Page 16 of 31

I conducted a clinical interview with N.N. on June 4, 2026. Throughout our time together, she remained attentive and fully oriented to her surroundings, participating willingly and engaging with the process in good faith.

N.N. stayed present/focused throughout the assessment and applied genuine effort to every task asked of her, with her attention and concentration remaining consistent from start to finish. She followed the assessment procedures and instructions without difficulty, and at no point did she appear to struggle with comprehending what was being asked of her. Based on these observations, it is my professional opinion that the information N.N. provided during this assessment is reliable and valid.

## 2.    Opinion

### N.N.'s Vulnerabilities

N.N.'s parents fled Uganda during the genocide as asylum seekers, meeting one another in a refugee camp where her father served in the army and her mother was also displaced. They eventually settled in the United States and raised their children, including N.N. and her siblings, within a strict, deeply religious household. N.N.'s mother worked two jobs to support the family, and she would not allow N.N. to leave the house, have a phone, or spend time with friends outside of church. Her social world was confined entirely to people from the congregation, and she was routinely shuttled between church families' homes while her mother worked, often dropped off with people she barely knew.

N.N. was raped at twelve years old by a man from that church community. This was her first sexual encounter. In the aftermath, N.N. went silent for weeks. Once back in class, she confided in her guidance counselor, who reported it and triggered a DFCS investigation. N.N.'s parents did not believe her. They sent her back to the same church, where her attacker would mock her openly. Through all of this, something shifted in how her father treated her, too: where she'd once been allowed to sit up front in the car with him, he began locking the front door and making her ride in the back.

That betrayal seems to have severed something in her relationship with her family and her sense of safety at home. N.N. began pulling away from her family and seeking connection outside the home. She had been a strong student before this, involved in her middle school's performing arts program and later in a competitive medical program in high school where she took college-level coursework. By fifteen, that was gone. She would get dropped off at school and simply not walk in. She missed roughly two hundred days that year.

Plaintiff N.N. 3680

In 2020, N.N. ran away from her parents' home in Florida for the last time. She went to stay with her friend and her friend's family, and was there at least through her birthday, when her friend's family threw her a party. N.N. had hopes she could stay with them indefinitely. But eventually that fell through, and she found herself with no housing and no family she could call.

N.N. left Florida with a young woman she had met at a party and headed to Atlanta. On the way, they stopped at a gas station. It was there that N.N. met a man who went by Pablo, and the two of them exchanged numbers. N.N. and the young woman continued on to their destination, where N.N. was told she could not stay. Pablo was the only other person she knew of in Atlanta. N.N. called him.

The experiences N.N. described prior to her exploitation reflect several factors commonly associated with increased vulnerability to trafficking and exploitation. These factors include prior sexual victimization, family conflict and rejection following disclosure of abuse, prior experiences in which disclosures of abuse did not result in protection or intervention, social isolation, repeated running away, housing instability, and the absence of consistent sources of support. These experiences are consistent with a pattern of vulnerabilities that may increase susceptibility to manipulation and exploitation by traffickers.

## N.N.'s Traffickers' Methods of Exploitation

N.N.'s reported history reflects multiple methods of recruitment, grooming, coercion, and control commonly associated with the trafficking and commercial sexual exploitation of minors.

After Pablo picked N.N. up, he took her to get her hair done, paid for a manicure, and bought her new shoes and clothes. Only after providing these items did Pablo explicitly describe what he expected in return. He took N.N. to Fulton Industrial Boulevard and instructed her on how to "work" the streets, including which areas were considered safer and which to avoid.

Next, Pablo took N.N. to a strip club on Fulton Industrial Boulevard. Pablo instructed N.N. to exit the vehicle, stand beneath the club's sign, wave and smile at passing vehicles, and tell the men who stopped how much it would cost to purchase N.N. for sex. N.N. reported that she was afraid. She had only recently met Pablo, knew he had a firearm, and was unfamiliar with the area. According to N.N., she believed she had to comply with his instructions because she feared for her safety. This sequence is consistent with grooming behaviors commonly used by traffickers to isolate victims and

N.N. v. Lincourt, et al.
Civil Action File No.1:25 cv-04313-MHC

establish a sense of fear of and obedience to the trafficker.

N.N.'s trafficking began with car dates and progressed quickly to hotel rooms. Any time N.N. told Pablo that she no longer wanted to continue seeing dates, he told her that she would be homeless if she stopped. At the time, N.N. lacked stable housing, family support, and independent financial resources. The threat of homelessness functioned as a coercive mechanism that limited her perceived ability to leave the situation. The use of housing insecurity and economic dependence to maintain control is consistent with commonly documented trafficking dynamics.

After Pablo, N.N. met another trafficker known as Scarface. According to N.N., Scarface had more power and influence than Pablo and ultimately took N.N. from Pablo. Scarface was the first in a series of traffickers whom N.N. described as relying primarily on violence and intimidation to maintain control.

According to N.N., Milton (also known as "Slim"), was different from the traffickers who came before him. Whereas earlier traffickers relied primarily on physical violence and overt displays of control, Milton primarily exercised control through forms of psychological manipulation. Though there were instances of violence and threats of violence, Milton presented to N.N. as someone who cared for her, a tactic commonly associated with "Romeo" traffickers who use affection, attention, and emotional attachment to establish dependency and control.

The insidious nature of this form of trafficking is that the exploitation is often disguised as a romantic or caring relationship. Victims may experience feelings of attachment, loyalty, or love toward the trafficker, making it difficult to recognize the exploitation. The trafficker's alternating displays of affection and control can create a powerful emotional bond, particularly for individuals with unmet needs for safety, stability, or support.

When asked in a prior deposition whether she had a trafficker at the Super 8, N.N. said she did not. According to N.N., that testimony reflected her understanding of her experience at the time. Delayed recognition of exploitation is common among trafficking victims, many of whom do not identify their experiences as trafficking until months or years after the exploitation has ended.

N.N.'s trafficking by Milton ended when he sent N.N. to deliver drugs to a John who turned out to be an undercover officer. Afterward, she found out she was pregnant and was placed in a group home, where other girls picked fights with her specifically because they knew she wouldn't fight back. Despite everything, she ran from the group home and went back to the Super 8, looking for Milton. This pattern of

Plaintiff N.N. 3682

returning to the trafficker is consistent with the dynamics of trauma bonding. Instead of finding Milton, she encountered individuals who lured her into a room under the guise of shelter and then forced her to have sex, holding her there against her will.

N.N.'s experiences illustrate several commonly documented methods of trafficking-related coercion and control. Her initial recruitment involved the provision of gifts, attention, and material support before explicit expectations were communicated. As the exploitation progressed, control was maintained through threats tied to N.N.'s housing instability and lack of financial resources. N.N. subsequently described being controlled by traffickers who relied primarily on violence and intimidation, followed by a trafficker who mainly exercised control through psychological manipulation and emotional attachment. N.N.'s account reflects patterns of coercion and control commonly observed in trafficking situations.

### N.N's Inability to Seek Help and Escape

The reasons N.N. remained in her trafficking situation, and the reasons she did not seek help sooner, align with commonly recognized barriers to seeking help or escaping in sex trafficking cases. At the time of her exploitation, N.N. reportedly lacked stable housing, family support, and alternative sources of financial or emotional assistance. N.N. also reported a prior experience in which disclosures of abuse did not result in protection or intervention.

N.N.'s movement from one trafficker to another is also consistent with patterns commonly observed among trafficking victims. Leaving an individual trafficker does not necessarily eliminate the vulnerabilities that contributed to the exploitation in the first place. Even when N.N. separated from one trafficker, the circumstances that contributed to her vulnerability remained largely unchanged. Consequently, separation from one trafficker did not eliminate her risk of subsequent exploitation.

Although Milton primarily exercised control through psychological manipulation and emotional attachment, N.N. also reported episodes of physical violence and threats of serious harm. According to N.N., Milton choked her and threatened to "put a bullet" in her head if she attempted to leave. In trafficking situations, physical violence need not be constant to be effective. Intermittent violence or credible threats of violence are enough to create a fear in victims that discourages disclosure or escape.

Another barrier to seek help or escape included the environmental normalization of prostitution and sex trafficking. N.N. reported that trafficking activity at the hotels where she was trafficked occurred openly and in the presence of adults, contributing to

Plaintiff N.N. 3683

a perception that such activity was commonplace and acceptable. According to N.N., hotel staff and other adults at the Super 8 appeared aware of the trafficking activity and, in some cases, facilitated it. For example, she reported that a hotel security guard warned Milton when police were expected, giving Milton the opportunity to avoid detection. N.N. also described interactions with other employees, such as the front desk and housekeeping, who appeared familiar with the presence of trafficked girls and treated their presence as routine.

N.N. further reported that commercial sex activity was highly visible throughout the property. She described observing vehicles in the parking lot where sexual transactions were occurring, girls openly soliciting buyers from hotel balconies, and a practice of warning traffickers when police arrived so that trafficking activity could be concealed until law enforcement left the area. According to N.N., many of the girls being trafficked at the hotel were minors.

Repeated exposure to an environment in which exploitation is openly visible and normalized can significantly affect a victim's perception of available help and protection. When adults appear unwilling to intervene, or are perceived as actively facilitating the exploitation, victims may conclude that seeking help is futile or potentially dangerous. Such conditions reduce the likelihood of disclosure or escape.

N.N.'s decision to return to Milton following placement in a group home is not inconsistent with victimization. At the time, N.N. remained a minor, was pregnant, lacked stable family support, and had few meaningful alternatives for housing, safety, or emotional connection. According to N.N., while in the group home she was involved in conflicts with other residents, who reportedly targeted her because they believed her pregnancy would make her less likely to defend herself physically.

Milton had cultivated a relationship that combined affection, psychological manipulation, threats, and violence. Such dynamics can create powerful emotional attachments and dependencies that persist even after the victim is physically separated from the trafficker. Accordingly, N.N.'s attempt to return to Milton is consistent with patterns frequently observed among trafficking victims.

Overall, N.N.'s account reflects multiple factors that may have made it more difficult to seek help or leave the trafficking situation, including lack of stable housing and social support, prior experiences in which disclosures did not result in protection, fear resulting from threats and violence, environmental normalization of trafficking, perceived indifference or complicity from surrounding adults, feelings of isolation and helplessness, and psychological dependence associated with ongoing manipulation. Collectively,

Plaintiff N.N. 3684

these factors are consistent with barriers commonly observed among victims of sex trafficking.

## Impact of Trafficking on N.N.

N.N. reported that the effects of her trafficking experience have continued long after her physical escape from the trafficking environment. She described ongoing psychological distress, including intrusive memories, chronic anxiety, hypervigilance, sleep disturbance, and periods of emotional dysregulation that continue to affect her daily functioning and interpersonal relationships.

N.N. further reported that certain locations and reminders associated with the trafficking remain emotionally triggering. She stated that she currently resides in Covington, Georgia, in part because she wanted to be as far from Atlanta as possible, explaining that the Atlanta area contains numerous reminders of the trafficking experience. She also described persistent fears regarding the safety of her daughter, and reported heightened concern that her daughter could one day experience harms similar to those that N.N. endured.

N.N. reported a history of self-harm and suicidal ideation following the trafficking period. Although she denied any suicide attempts, she reported previously engaging in wrist-cutting behaviors during periods of emotional distress. She has sought mental health treatment from multiple therapists and reported prior diagnoses including anxiety and bipolar disorder. At the time of the assessment, she continued to search for treatment approaches that she felt adequately addressed the emotional consequences of her experiences.

N.N. also described physical consequences associated with trafficking. She reported prolonged food deprivation during the period of exploitation, stating that she often survived on minimal food and was substantially underweight when ultimately removed from the trafficking environment. In addition, she reported contracting syphilis during the trafficking period while pregnant, resulting in medical treatment for both herself and her child. N.N. identified both the pregnancy and the sexually transmitted infection as lasting reminders of the trafficking experience that continue to affect her emotionally.

Considering all materials reviewed, it is in this assessor's expert clinical opinion that N.N. reports experiences and symptoms associated with significant trauma. N.N.'s reported symptoms, including intrusive thoughts, hypervigilance, anxiety, sleep disturbance, emotional dysregulation, self-harm history, and relationship difficulties,

Plaintiff N.N. 3685

N.N. v. [...] Inc., et al.
Civil Action File No.1:25 cv-04313-MHC

are consistent with the symptom profile of post-traumatic stress disorder as catalogued in the DSM-5. N.N.'s symptom pattern is consistent with the patterns commonly observed among survivors of sex trafficking.

## B. Common Trafficking Environment

There are several commonalities among the description of this Super 8's environment that are consistent with the environments commonly reported as venues of significant sex trafficking activity. The Super 8 is located right off of a busy interstate. This is often the case in sex trafficking contexts because such a location provides easy access, but also escape, for the traffickers and Johns.

N.N. reported being mostly trafficked on the back side of the hotel, which is not easily accessible or visible. Ms. Vanterpool reported that the Super 8 deliberately placed drug dealing and prostitution on the back side of the building. Being intentionally placed in hard to observe areas of a property is a common tactic of sex traffickers and the environments in which trafficking occurs because eluding the police is in the traffickers' and Johns' interests.

The volume of trafficking activity reported was also consistently high and suggested that illegal commercial sex, like sex trafficking, was common at the Super 8. This, too, is consistent with other trafficking cases. Traffickers are often aware of the busy areas for commercial sex and frequently congregate in the same environments in order to maximize their business—the sale of children for sex. In many ways, this is similar to how most businesses find their location. Children are sold for sex frequently in areas where commercial sex is a more common occurrence. In other words, it is easier for traffickers to find buyers for illegal commercial sex in the places where buyers of illegal sex are already comfortable frequenting.

Ms. Phillips, who lived on the property practically 24 hours a day, reported that drugs and prostitution were commonplace at the Super 8. According to Ms. Phillips, there were always girls dressed in skimpy clothes and lots of men coming in and out of rooms for short periods. According to her, many of the girls being sold looked like they were in middle school or high school.

Ms. Vanterpool similarly reported that girls younger than 18 were openly walking the parking lot selling sex, and that she regularly found used condoms, dildos, drugs, and guns in the rooms she cleaned. Ms. Vanterpool further reported that there were always men renting rooms with multiple girls staying in them.

Plaintiff N.N. 3686

N.N. v. Lincoln Suites, Inc.
Civil Action File No.1:25 cv-04313-MHC

The Super 8's manager, Louis Vu, also reported that he saw younger girls at the hotel. In addition, the Super 8 acknowledged that women engaged in prostitution regularly frequented the property. This level of activity normalizes the illegal activities like sex trafficking for the traffickers, Johns, and the victims. It encourages traffickers and Johns in their activities by feeling safe from the police and welcomed, while at the same time, discourages victims from escaping because by appearances, many of the people in this environment either seem to be involved, or accepting of the normalization of sex trafficking.

Considering all the material reviewed, the environment fostered at the Super 8 is consistent with the environments reported by most sex trafficking victims I have encountered or worked with. It is possible for trafficking to happen anywhere, but in reported cases, environments permissive of crime, specifically of illegal sex like prostitution or sex trafficking, are the most commonly-utilized environments in which to traffic victims, as was the case with N.N.

Signed: _____Date: ___June 30, 2026_____

Plaintiff N.N. 3687

# Exhibit A

- JR Complaint & Exhibits
- Deft's Answer to JR Complaint
- NN Complaint & Exhibit
- Deft's Answer to NN Complaint
- TH Complaint & Exhibit
- Deft's Answer to TH Complaint
- DB Complaint
- Deft's Answer to DB Complaint
- Rocker Complaint
- Pltf ROG Resps NN
- Pltf RPD RESP NN
- NN 1st RFA to Defendant
- NN 1st Rogs to Defendant
- NN 1st RPDs to Defendant
- Pltf RFA Resp NN
- ROG Verification - NN
- DEF Rogs, RPDs and RFAs to Pltf NN
- DEF Lincoln Bancorp COS Resp to Pltf Rogs, RPDs, and RFAs NN
- DEF RESP to Rogs, RPDs NN
- DEF RESP to RFAs NN
- (N.N.) COSD-2026.06.10 - - 2nd RPD to Plf
- (N.N.) DISC. RQST – 2026.06.10 - - 2nd RPD to Plf
- 027.0-30(B)(6) NOD Lincoln Bancorp, LLC
- 028.0-Pltf NOD Louis Vu JR
- 029.0-Pltf's NOD Tony Tran JR
- 029.0-Deft's NOD of Pltf JR
- NOD NN
- NOD TH
- Tony Tran Dep Transcript & Exhibits
- Lincoln Bancorp 30(b)(6) Dep Transcript & Exhibits
- J.R. Dep Transcript & Exhibits
- Louis Vu Dep Transcript & Exhibits
- NN Depo Transcript & Exhibits
- TH Depo Transcript & Exhibits
- Santana Phillips Declaration
- Winkeisha Vanterpool Declaration
- Declaration of Terrell Evans Super 8
- TH Fulton DA File
- National Center for Missing and Exploited Kids (NCMEC) Subpoena & Document Production
- 11Alive - Person shot, killed at motel in College Park.pdf
- 2021-07-14-Yelp-Review-Super8, Old National.pdf
- 95.5 WSB - Police investigating body found at College Park motel near airport.pdf

**Plaintiff N.N. 3688**

N.N. v. Lincoln Rd. LLC, et al.
Civil Action File No.1:25 cv-04313-MHC

Case 1:25-cv-04313-MHC    Document 47-5    Filed 07/07/26    Page 25 of 31

- 95.5 WSB - Suspect arrested after 13-year-old abducted from motel in College Park.pdf
- AJC - Argument leads to deadly shooting at College Park.pdf
- ANF - 13-year-old girl rescued, suspect arrested after possible abduction at College Park motel, police say.pdf
- ANF - 5 arrested after undercover College Park prostitution sting.pdf
- ANF - Dozens evicted as officials shut down Super 8 after operating without a permit.pdf
- ANF - Police searching for gunman, woman after man found dead near College Park hotel.pdf
- ANF - Teen rescued after possible kidnapping at College Park motel.pdf
- Fox 5 - Human trafficking investigation opened after 13-year-old girl reportedly kidnapped in College Park.pdf
- Fox 5 ATL - 5 arrests made in College Park prostitution sting.pdf
- Fox 5 ATL - Couple sought in deadly shooting at Super 8 motel in College Park.pdf
- Fox 5 ATL - Motel near Atlanta's airport evacuated after fire in laundry room.pdf
- Fox 5 ATL - South Fulton Police rescue human trafficking victims, suspect in custody.pdf
- PD Press Release - Prostitution Detail.pdf
- Super 8 - 4979 Old National Hwy Reviews.pdf
- Super 8 - 4979 Old National Hwy reviews - Copy_Redacted.pdf
- WJCL - Police in Georgia make arrest after reported child kidnapping at motel.pdf
- WSB-TV ATL - 5 arrested following undercover prostitution sting in College Park.pdf
- WSB-TV ATL - Man shot to death after argument at Super 8 motel near airport, police say.pdf
- WSB-TV ATL - Suspect arrested after 13-year-old girl abducted from motel in College Park.pdf
- Calls for Svc 4979 ONH 20130101-20250225.pdf
- Calls for Svc 4979 ONH.pdf
- College Park PD Incident Report.pdf
- Incident_2000168.pdf
- Incident_2000326.pdf
- Incident_2000378.pdf
- Incident_2000487.pdf
- Incident_2000566.pdf
- Incident_2000731.pdf
- Incident_2001111.pdf
- Incident_2001126.pdf
- Incident_2002111.pdf
- Incident_2002123.pdf
- Incident_2002132.pdf
- Incident_2002595.pdf
- Incident_2003685.pdf
- Incident_2004788.pdf

Plaintiff N.N. 3689

- Incident_2004840.pdf
- Incident_2004954.pdf
- Incident_2005180.pdf
- Incident_2005571.pdf
- Incident_2005647.pdf
- Incident_2006021.pdf
- Incident_2006026.pdf
- Incident_2006186.pdf
- Incident_2006322.pdf
- Incident_2006600.pdf
- Incident_2007021.pdf
- Incident_2007241.pdf
- Incident_2007278.pdf
- Incident_2007363.pdf
- Incident_2007376.pdf
- Incident_2007498.pdf
- Incident_2007684.pdf
- Incident_2007760.pdf
- Incident_2007774.pdf
- Incident_2007825.pdf
- Incident_2008140.pdf
- Incident_2008195.pdf
- Incident_2008346.pdf
- Incident_2008451.pdf
- Incident_2008739.pdf
- Incident_2008741.pdf
- Incident_2008852.pdf
- Incident_2008943.pdf
- Incident_2008986.pdf
- Incident_2008988.pdf
- Incident_2009139.pdf
- Incident_2009578.pdf
- Incident_2009667.pdf
- Incident_2009823.pdf
- Incident_2009824.pdf
- Incident_2009825.pdf
- Incident_2009937.pdf
- Incident_2010005.pdf
- Incident_2010016.pdf
- Incident_2010073.pdf
- Incident_2010079.pdf
- Incident_2010125.pdf
- Incident_2010143.pdf
- Incident_2010179.pdf
- Incident_2010238.pdf
- Incident_2010270.pdf
- Incident_2010634.pdf
- Incident_2010708.pdf

Plaintiff N.N. 3690

- Incident_2010890.pdf
- Incident_2011274.pdf
- Incident_2011400.pdf
- Incident_2011476.pdf
- Incident_2011565.pdf
- Incident_2011964.pdf
- Incident_2012298.pdf
- Incident_2012478.pdf
- Incident_2012494.pdf
- Incident_2012692.pdf
- Incident_2012694.pdf
- Incident_2013066.pdf
- Incident_2100076.pdf
- Incident_2100129.pdf
- Incident_2100303.pdf
- Incident_2100446.pdf
- Incident_2100701.pdf
- Incident_2100843.pdf
- Incident_2100865.pdf
- Incident_2101000.pdf
- Incident_2101217.pdf
- Incident_2101480.pdf
- Incident_2101729.pdf
- Incident_2101833.pdf
- Incident_2101927.pdf
- Incident_2102011.pdf
- Incident_2103024.pdf
- Incident_2103024_1.pdf
- Incident_2103430.pdf
- Incident_2103432.pdf
- Incident_2103435.pdf
- Incident_2103481.pdf
- Incident_2103504.pdf
- Incident_2103741.pdf
- Incident_2103745.pdf
- Incident_2103848.pdf
- Incident_2104387.pdf
- Incident_2104467.pdf
- Incident_2104563.pdf
- Incident_2104570.pdf
- Incident_2104659.pdf
- Incident_2104922.pdf
- Incident_2104924.pdf
- Incident_2104925.pdf
- Incident_2105006.pdf
- Incident_2105082.pdf
- Incident_2105087.pdf
- Incident_2105169.pdf

Plaintiff N.N. 3691

- Incident_2105244.pdf
- Incident_2105433.pdf
- Incident_2105747.pdf
- Incident_2105831.pdf
- Incident_2105893.pdf
- Incident_2106075.pdf
- Incident_2106103.pdf
- Incident_2106175.pdf
- Incident_2108887.pdf
- Incident_2109014.pdf
- Incident_2109017.pdf
- Incident_2109106.pdf
- Incident_2109117.pdf
- Incident_2109162.pdf
- Incident_2109282.pdf
- Incident_2109398.pdf
- Incident_2109708.pdf
- Incident_2109819.pdf
- Incident_2200025.pdf
- Incident_2200247.pdf
- Incident_2200289.pdf
- Incident_2200760.pdf
- Incident_2200800.pdf
- Incident_2200911.pdf
- Incident_2200943.pdf
- Incident_2201142.pdf
- Incident_2201144.pdf
- Incident_2201145.pdf
- Incident_2201274.pdf
- Incident_2201285.pdf
- Incident_2201676.pdf
- Incident_2208081.pdf
- Incident_2302987.pdf
- Incident_2303289.pdf
- Incident_2303305.pdf
- Incident_2305892.pdf
- Incident_2306110.pdf
- Incident_2306527.pdf
- Incident_2306835.pdf
- Incident_2306838.pdf
- Incident_2307737.pdf
- Incident_2308909.pdf
- Incident_2309413.pdf
- Incident_2309945.pdf
- Incident_2310687.pdf
- Incident_2311981.pdf
- Incident_2312453.pdf
- Incident_2313039.pdf

Plaintiff N.N. 3692

N.N. v. Lincoln Academy
Civil Action File No.1:25 cv-04313-MHC

- Incident_2314053.pdf
- Incident_2314080.pdf
- Incident_2400158.pdf
- Incident_2400643.pdf
- Incident_2402284.pdf
- Incident_2403142.pdf
- Incident_2403170.pdf
- Incident_2403206.pdf
- Incident_2403573.pdf
- Incident_2403759.pdf
- Incident_2403858.pdf
- Incident_2404426.pdf
- Incident_2405247.pdf
- Incident_2407706.pdf
- Incident_2407973.pdf
- Incident_2408069.pdf
- Incident_2408125.pdf
- Incident_2408553.pdf
- Incident_2409140.pdf
- Incident_2409142.pdf
- Incident_2413569.pdf
- Incident_2414033.pdf
- Incident_2414427.pdf
- Incident_2500264.pdf
- Incident_2500639.pdf
- Incident_2501537.pdf
- Incident_2501826.pdf
- Incident_2503179.pdf
- Incident_2504175.pdf
- Incident_2504655.pdf
- Incident_2504700.pdf
- Incident_2505852.pdf
- Incident_2507245.pdf
- Incident_2507467.pdf
- Incident_2507887.pdf
- Incident_2507977.pdf
- Incident_2508310.pdf
- Incident_2508696.pdf
- Incident_2508881.pdf
- Incident_2509136.pdf
- PD Press Release - Prostitution Detail.pdf
- PLAINTIFF 1532- 1542 case numbers.xlsx
- PLAINTIFF NN 1528- at hotel.PNG
- PLAINTIFF NN 1529- e4258b86c4d24297808063cd29565dcf.MOV
- PLAINTIFF NN 1530- ORR PD-2025-403.xlsx
- PLAINTIFF NN 1531- 060c6544159f444594eb89d4fd4c7ae8.MOV
- PLAINTIFF NN 1533- 8400ca8eb4fd45fd847d5f1fb6205b62.MOV
- PLAINTIFF NN 1534- 923E14A1-1A14-45D8-A43E-AB8DCB4EF31B.JPG

Plaintiff N.N. 3693

N.N. v. Lincoln Road, LLC, et al.
Civil Action File No.1:25 cv-04313-MHC

Case 1:25-cv-04313-MHC    Document 47-5    Filed 07/07/26    Page 30 of 31

- PLAINTIFF NN 1535- AF68C612-3A96-4AC1-8BE9-A8C8347292F9.JPG
- PLAINTIFF NN 1536- F9283D67-A99F-4B3B-8107-8100837A6403.JPG
- PLAINTIFF NN 1537- ORR PD-2025-1542 (2) (1).xlsx
- PLAINTIFF NN 1538- SUPER8-OLD NATIONAL- Snapchat-1523419314.jpg
- PLAINTIFF NN 1539- SUPER8-OLD NATIONAL-Snapchat-277277342.mp4
- PLAINTIFF NN 1540- 02ba2bffe7cc4b3da5ef3d690a3253e9.MOV
- PLAINTIFF NN 1541- 3683918836194296b88a08775b52e20d.MOV
- PLAINTIFF NN 1647.docx
- Santana Phillips Declaration.pdf
- Super 8 - 4979 Old National Hwy Reviews - Copy.pdf
- Super 8 - 4979 Old National Hwy reviews - Copy_Redacted.pdf
- WJCL - Police in Georgia make arrest after reported child kidnapping at motel.pdf
- WSB-TV ATL - 5 arrested following undercover prostitution sting in College Park.pdf
- WSB-TV ATL - Man shot to death after argument at Super 8 motel near airport, police say.pdf
- WSB-TV ATL - Suspect arrested after 13-year-old girl abducted from motel in College Park.pdf
- 2020- Missing Person- ████████s.pdf
- 2020-06-18-Missing Alert- N.████████pdf
- 2021-05-22-McDonough Police Department-Records-N ████████pdf
- 2021-05-30-Facebook-Missing People in America- N. ████████pdf
- 8376579 Doe.Jane 051122.full.pdf
- College Park PD Incident Report.pdf
- PLAINTIFF NN 1768- 1652198604952.mp4
- PLAINTIFF NN 1769- 1652198702633.mp4
- PLAINTIFF NN 1770- 1652198710027.mp4
- PLAINTIFF NN 1771- 2020.4.30 JR missing post Facebook.png
- PLAINTIFF NN 1772- 1652198548639.mp4
- PLAINTIFF NN 1773- 2020-10-21-N ████████Super Inn- Photo.jpg
- PLAINTIFF NN 1774- 2020-10-31-N ████████ Super Inn Photo.jpg
- PLAINTIFF NN 1775- 2021-5-9 JR missing post Facebook.png
- PLAINTIFF NN 1776- 2025-8-11 JR Missing post.jpg
- PLAINTIFF NN 1777- filtered-0A404A30-0F82-441B-9A0B-CC0C74EB7947.MP4
- PLAINTIFF NN 1778- filtered-0C84E2D8-0E6E-42A5-AB0F-34AB6D22D355.MP4
- PLAINTIFF NN 1779- filtered-8E4D113E-D59E-4609-9087-E172346A1E0E.MP4
- PLAINTIFF NN 1780- filtered-96484E12-50D1-4E6E-8C6C-06DBDA645695.MP4
- PLAINTIFF NN 1781- filtered-E213BCB6-4D09-4F9D-B72D-6EEA24A2A021.MP4
- PLAINTIFF NN 1782- filtered-F6639242-6900-493B-9614-A19794ADE157.MP4
- PLAINTIFF NN 1783- filtered-FE573DBB-E5CD-4D1A-BB41-560E0207CAB1.MP4
- PLAINTIFF NN 1784- JR ID.jpg
- PLAINTIFF NN 1785- N.N. ID Front.jpg
- PLAINTIFF NN 1786- N.N. ID Back.jpg
- PLAINTIFF NN 1787- Screenshot_20220120-215524_Snapchat.jpg
- PLAINTIFF NN 1788- Screenshot_20220121-123943_Snapchat.jpg
- PLAINTIFF NN 1789- Snapchat-1296237779.mp4
- PLAINTIFF NN 1790- Snapchat-26436958.jpg

Plaintiff N.N. 3694

- PLAINTIFF NN 1791- Snapchat-452154361.mp4
- PLAINTIFF NN 1792- Snapchat-640863389.mp4
- PLAINTIFF NN 1793- Snapchat-689380336.mp4
- PLAINTIFF NN 1794- SUPER8-OLD NATIONAL- Snapchat-1523419314.jpg
- PLAINTIFF NN 1795- SUPER8-OLD NATIONAL-Snapchat-277277342.mp4
- PLAINTIFF NN 1796- TH ID.jpeg
- PLAINTIFF NN 1797- Video- Altercation outside of Fannies.MOV
- (1) CGL PAV0220391 2019-20.pdf
- (10) 2020_W-2s (PO).pdf
- (11) 2021_Employee Wages (PO).pdf
- (12) Evanston Excess 2019 - 2020.pdf
- (13) Human Trafficking Poster.pdf
- (14) Super 8 - Employee Policy and Procedure Handbook.pdf
- (15) Super 8 - Human Trafficking Awareness Pamphlet.pdf
- (16) Trafficking Training Ack.pdf
- (2) CGL PAV0277177 2020-21.pdf
- (3) Evanston Excess 2020-21.pdf
- (4) ROR - Lincoln Bancorp.pdf
- (5) ROR - Lincoln Property.pdf
- (6) Franchise Agreement and Addendum (PO).pdf
- (7) Super 8 FDD_no financials.pdf
- (8) Super 8 Hotel_Vendors Report.pdf
- (9) Super 8 Hotel_Payroll Report (PO).pdf
- Production Document List.xlsx

Plaintiff N.N. 3695